IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

INTERNATIONAL   HOME   PRODUCTS,
INC.,

    **Appellant-Debtor,**

         **v.**

FIRST BANK OF PUERTO RICO, INC.,

    **Appellee, Creditor.**

**Civil No.** 12-1515 (FAB)

**Civil No.** 12-2026 (FAB)

**MEMORANDUM AND ORDER**

    Before the Court are the bankruptcy appeals of Civil Cases
Nos. 12-1515 and 12-2026.[1]

**I.    BACKGROUND**

    **A.    Factual History**

    The Court draws the following relevant facts from the
bankruptcy court's order dated May 15, 2012, (Docket No. 1-4 at
pp. 58-62):

    On January 16, 2001, First Bank of Puerto Rico, Inc.
("First Bank"), Health Distillers International, Inc. ("HDI"), and
International Home Products, Inc. ("IHP") entered into a Credit
Agreement.  The Credit Agreement granted IHP and HDI (collectively,

---

[1] All citations to the record reference the Case No. 12-2026
docket, unless otherwise noted.

"the debtors")[2] certain credit facilities in the aggregate principal amount of $22.5 million, comprised of: a revolving credit facility to IHP and HDI in the principal amount of $15 million ("Operating Line"); and a five (5) year Senior Secured Term Loan credit facility to IHP up to the principal amount of $7.5 million ("Term Loan") (collectively, the "Loans").

After various amendments, on December 3, 2009, First Bank, IHP, and HDI subscribed an "Amended and Restated Credit Agreement" where First Bank granted the Debtors credit facilities in the aggregate amount of $38,289,099.64 (consisting of $26 million of the Operating Line and $12,289,099.64 of the Term Loan of IHP). The Amended and Restated Credit Agreement was authenticated pursuant to affidavit number 26,301 of Notary Public Heberto de Vizcarrondo-Armstrong (the "Credit Agreement").

On January 16, 2001, First Bank and IHP executed a Security Agreement, authenticated before Notary Public F. Vazquez-Santoni, affidavit number 34,911, whereby IHP pledged and granted to First Bank, as collateral to secure all of the obligations under the Credit Agreement, a lien upon all:

---

[2] In the appellant's brief, IHP explains that it is the "primary Debtor" and HDI is its sister company. (Case No. 12-1515, Docket No. 22 at p. 4 n. 1.) During the course of the bankruptcy proceedings, the bankruptcy court ordered the substantive consolidation of IHP and HDI into a single entity. Id. Accordingly, the terms "debtor" and "debtors" used throughout this Memorandum and Order refer to the consolidated entity of IHP and HDI.

> [O]f its right, title and interest in, to and under the following property whether now owned by or owing to, or hereafter acquired by or arising in favor of Grantor . . . (all of which being hereinafter collectively referred to as the "Collateral"):
>
> . . .
>
> all equipment;
>
> . . .
>
> all goods;
>
> . . .
>
> all inventory;
>
> . . .
>
> all investment property;
>
> . . .
>
> all money, cash or cash equivalents;
>
> to the extent not otherwise included, all proceeds and products of the foregoing and all accessions to, substitutions and replacements for, rents and profits of, each of the foregoing.

The Security Agreement further provided:

> Grantor also hereby authorizes Lender to file any such financing or continuation statements without the signature of Grantor to the extent permitted by applicable law.  If any amount payable under or in connection with any of the Collateral is or shall become evidenced by any Instrument, such Instrument, other than checks and notes received in the ordinary course of business, shall be duly endorsed in a manner satisfactory to Lender immediately upon Grantor's receipt thereof.

On the same date that they executed the Security
Agreement, First Bank and IHP also executed an Assignment of Rents
agreement (the "Assignment of Rents"), authenticated before Notary
Public F. Vazquez-Santoni, affidavit number 34,913, whereby IHP
assigned and granted to First Bank, as collateral to secure all of
the obligations under the Credit Agreement, its interest in all the
rents receivable as described in the Agreement.

First Bank perfected its security interests by filing
corresponding UCC-1 Financing Statements (the "2001 Financing
Statements").  The original Financing Statements cover IHP's
inventory, merchandise, goods, other personal property, and their
proceeds, which are held by or on behalf of IHP, as well as the
rents assigned.  The 2001 Financing Statements were initially filed
before the Puerto Rico Commercial Transactions Registry (the
"Registry") on January 26, 2001.  They lapsed ten (10) years after
their filing — on January 26, 2011.

To perfect its security interest over the collateral
covered by the 2001 Financing Statements, which had lapsed, First
Bank filed another set of financing statements on July 19, 2011
(the "2011 Financing Statements").  The 2011 Financing Statements
covered the same collateral as the original 2001 Financing
Statements, but they lacked IHP's signature.  With the intention of
terminating the 2011 Financing Statements, IHP filed two UCC-3
termination statements (the "Termination Statements") with the

Puerto Rico Commercial Transactions Registry on February 16, 2012.
The Termination Statements do not have the signature of First Bank
and were not authorized by it.  On April 4, 2012, First Bank sent
IHP, HDI, and the Guarantors a formal Notice of Default (the
"Notice of Default").

On April 10, 2012, six days after First Bank sent IHP the
Notice of Default, IHP filed an "Urgent Motion for Order under 11
U.S.C. 105, 507(a)(4) and (5) Authorizing the Payment of Debtor's
Pre-Petition Employee Benefits and Priority Wages."  The bankruptcy
court granted IHP's motion for wages on April 26, 2012.  Later that
day, First Bank filed its Motion for Reconsideration, requesting
the following remedies:

i.   That the bankruptcy court prohibit IHP from
     using any of the cash that it has or receives,
     since it is the collateral of First Bank (the
     "Cash Collateral");

ii.  That the bankruptcy court order IHP to turn
     over to First Bank any present or future Cash
     Collateral in the possession, custody or
     control of IHP or any of its Insiders (as such
     term is defined in 11 U.S.C. § 101);

iii. That the bankruptcy court order IHP to
     segregate and account for all Cash Collateral
     received by or for the benefit of IHP since
     the filing of the petition;

iv.  That the bankruptcy court grant First Bank
     immediate access to the books and records of
     IHP, including all electronic records on any
     company computers, to make electronic copies,
     photocopies or abstracts of the business
     records of the debtor; and

      v.    Any other relief that the bankruptcy court
deems necessary and just.

In response, IHP filed its petition on April 27, 2012; First Bank filed its reply on May 1, 2012; and the bankruptcy court issued an order on May 15, 2012 which "prospectively [granted] the Bank's Motion for Reconsideration and determine[d] that the Bank has a valid security interest over [IHP's] cash, assets and rents." (Docket No. 1-4 at p. 1.)

During May and June 2012, the bankruptcy court held four hearings to consider IHP and HDI's use of cash collateral. (See Docket No. 5-3 at p. 17.) At a June 18, 2012 hearing, the bankruptcy court continued allowing the use of cash collateral, and on June 22, 2012, IHP and First Bank filed a Joint Motion Informing

Settlement with First Bank as to the Use of Cash Collateral.[3]
(Docket No. 5-3 at pp. 1-6.)

On August 3, 2012, First Bank filed a request for the
immediate turnover of funds allegedly withheld by the Debtors.
(See Docket No. 5-3 at pp. 8-15.)  It argued that proceeds
generated under pre-petition foreclosed consumer sales contracts
belong to First Bank, and thus they do not constitute property of
the bankruptcy estate.  Id.  IHP opposed First Bank's motion on
August 16, 2012, contending that it has already surrendered all
receivables, whether they were "foreclosed" or not, to First Bank.
(Docket No. 5-3 at p. 19.)  First Bank replied on August 24, 2012,

---

[3] The Joint Motion detailed that IHP owed "$23,192,605.34,
excluding accrued interests [sic] and penalties, in principal for
a revolving credit facility and $11,577,403.33, excluding accrued
interests [sic] and penalties, in principal for a term loan."
(Docket No. 5-3 at p. 2.)  It also provided the inventory and
accounts receivable of IHP.  Id. at pp. 2-3.  The debtors agreed to
limit their request for cash collateral to the use and sale of each
of their respective inventories, and they proposed to make cash
payments to First Bank.  Id. at p. 3.  The debtors also agreed to
surrender "their portfolio of all accounts receivable of IHP and
HDI as of the Petition Date," pledging "full cooperation in the
transfer of the Portfolios to [First Bank] under the terms to be
mutually agreed upon, in order to continue the effective and
efficient collection of such Portfolios, i.e. pre-petition Account
Receivables, and maximize their proceeds."  Id.  The parties also
agreed that "[a]s soon as this stipulation is approved, the Debtors
and [First Bank] will cooperate fully through the transition
process in order to protect the Portfolio[s] for the benefit of
[First Bank] and the Debtors will provide full access to [First
Bank]'s personnel to the Portfolios and all information and
documents, including the contracts and sales and accounting records
related to the Portfolios.  Debtors will also transfer to [First
Bank] the physical documents related to the Portfolios."  Id. at
p. 4.  On July 2, 2012, the bankruptcy court granted the Joint
Motion.  Id. at p. 7.

and the bankruptcy court granted First Bank's motion on October 22, 2012.  Its order merely directed the debtors to "turnover to [First Bank] any property foreclosed pre[-]petition by [First Bank] and which, consequently, is not property of the estate."   (Docket No. 5-3 at p. 22.)  IHP appeals.

## II.  Scope of the Appeal

As referenced above, the cases on appeal are Case Nos. 12-1515 and 12-2026.  In each case, IHP submitted two issues for appeal.

### A.   Case No. 12-1515

IHP submitted the following issues for appeal in Case No. 12-1515, pursuant to Bankruptcy Rule 8006:

> 1.   Whether the Bankruptcy Court's Order of May 15, 2012, holding that the finance statements that were filed without the Debtor's knowledge or signature and filed without any supporting documentation other than the expired 2001 finance statements on July 2011, submitted by First Bank to the Puerto Rico Department of State, gave rise to a valid security interest was in error.
>
> 2.   Whether the Bankruptcy Court's Order of May 15, 2012 committed reversible error when it substantially incorporated the draft order provided by First Bank that included facts and legal authority that were never presented before the Court despite timely opposition made by the Debtor.

(Civil No. 12-1515, Docket No. 3 at p. 1.)  In the appellant's brief, however, IHP voluntarily withdrew its designated second issue on appeal.  (Civil No. 12-1515, Docket No. 22 at pp. 6-7 n.2.)

B.   **Case No. 12-2026**

Also pursuant to Bankruptcy Rule 8006, IHP submitted the following seemingly convoluted issues for appeal in Case No. 12-2026:

> 1.   Whether the Bankruptcy [Court] erred when it ordered the turnover of property to a secured creditor because of an alleged pre-petition foreclosure when in the same case the Bankruptcy Court issued an Order on May 15, 2012 granting the same secured creditor a security interest over the same collateral *only* with *prospective* effect for a date that occurred *after the petition* and held hearings and issued orders regarding the use of cash collateral for the exact same allegedly foreclosed collateral allowing the Debtor's use of the collateral *after the petition date*;
>
> 2.   Whether the Bankruptcy Court erred when it determined that it has jurisdiction to confirm the legitimacy of a pre-petition foreclosure when at the time of the May 15, 2012 Order validating Firstbank's security interest was pending appeal in case no.: 12-1515 (JAF) and the issues raised in such appeal are the same issues raised here: whether the bank's security interest is a valid and perfected security interest.

(Case No. 12-2026, Docket No. 1-3 at pp. 1-2.)

First Bank contends that the first issue is not appropriately before the Court, because IHP only raises it "for the first time here on appeal." (Docket No. 12 at p. 5.) Because the prospective nature of the bankruptcy court's May 15, 2012 ruling "was never before the [b]ankruptcy [c]ourt when it entered the October 22, 2012 [o]rder that [IHP is] now appealing, First Bank requests that the issue be stricken from the record. <u>Id.</u> at

pp. 5-6 (citing B & T Masonry Constr. Co. Inc. v. Pub. Serv. Mut.
Ins. Co., 382 F.3d 36, 40 (1st Cir. 2004)).

       First Bank's argument is meritless.  Although the First
Circuit Court of Appeals has indicated that "legal theories not
raised squarely in the lower court cannot be broached for the first
time on appeal," that precedent is inapposite to this case because
IHP's first issue does not "assert a nascent theory that departs
dramatically from what [the party] argued in the court below."  Cf.
B & T Masonry, 382 F.3d at 39.  IHP references the "prospective"
nature of the May 15, 2012 ruling in order to dispute the
bankruptcy court's October 22, 2012 order, not as a "newly
contrived theory" of liability that constitutes a "bald-faced
switching of horses in mid-stream."  See id. at 40.  Furthermore,
as a prior interlocutory order, the bankruptcy court's May 15, 2012

ruling is independently reviewable on appeal.[4]   All prior
interlocutory orders, opinions and non-final partial judgments are
subject to review along with the appealable judgment.  See Brandt
v. Wand Partners, 242 F.3d 6, 15 (1st Cir. 2001) ("Where the
district court has made interlocutory decisions before entering a
final judgment, an appeal from the final judgment brings up the
interlocutory decisions for review . . . ."); see also Tringali v.
Hathaway Mach., 796 F.2d 553, 559 (1st Cir. 1986) (indicating that
entry of a final, appealable order will enable an appellant to
request review of earlier non-final decisions upon which the final
decision rests).  Accordingly, the Court addresses the bankruptcy
court's May 15, 2012 and October 22, 2012 orders in turn.

---

[4]  The Court notes the inconsistency in IHP's arguments
regarding the exact bankruptcy orders it is appealing.   IHP
contends that First Bank's original security interest lapsed prior
to First Bank filing a new statement in 2011, that the security
statement was void "ab initio," and that IHP's Termination
Statement is valid.  (Docket No. 13 at p. 4.)   It also states,
however, that it "is not appealing" the bankruptcy court's May 3,
2012 order which held that the Termination Statements were
ineffective.  (Docket No. 5 at p. 21.)   Yet, IHP also contends:

> [F]rom the date that the Department of State registered
> the Termination Statements, February 16, 2012, to the
> date that the [b]ankruptcy [c]ourt held that the
> statements were ineffective, May 3, 2012, First Bank did
> not have a valid and effective security interest.  Since
> First Bank contends that its alleged foreclosure took
> place during this period[,] the foreclosure could not
> have been pursuant to an effective and valid security
> interest.

(Docket No. 5 at pp. 21-22.)

## III. ANALYSIS

### A.   May 15, 2012 Order

The Court regards the bankruptcy court's May 15, 2012 order as well-reasoned and strongly supported by legal authority. "[W]hen a lower court produces a comprehensive, well-reasoned decision, an appellate court should refrain from writing at length to no other end than to hear its own words resonate." Lawton v. State Mut. Life Assur. Co. of Am., 101 F.3d 218, 220 (1st Cir. 1996) (citations omitted); see also In re San Juan Dupont Plaza Hotel Fire Litig., 989 F.2d 36, 38 (1st Cir. 1993) ("Where, as here, a trial court has produced a first-rate work product, a reviewing tribunal should hesitate to wax longiloquent simply to hear its own words resonate."). Having read the bankruptcy record and the parties' briefs with care, the Court affirms the bankruptcy court's judgment for substantially the reasons elucidated in the bankruptcy opinion. See Lawton, 101 F.3d at 220.

### 1.   Two-Step Analysis

The "critical issue" addressed by the bankruptcy court on May 15, 2012 was whether First Bank enjoys a valid and perfected security interest over IHP's assets and rents. To resolve that issue, the bankruptcy court correctly engaged in a two-part analysis, (Docket No. 1-4 at pp. 62-67):

First, the bankruptcy court examined whether First Bank's filing of the 2011 Financing Statements, even without IHP's

signature, is valid.  The bankruptcy court correctly concluded in the affirmative, citing the Puerto Rico Commercial Transactions Act ("CTA")[5] to address the parameters of security agreements, including their general validity and "perfected" status.  (Docket No. 1-4 at pp. 63-64) (citing P.R. Laws Ann. tit. 19 §§ 2103, 2051, 2152-53).  Both parties agreed that (1) in 2001, IHP granted First Bank a security interest in all of its assets by means of the Security Agreement; and that (2) First Bank perfected its security interests by filing the corresponding 2001 Financing Statements. (Docket No. 5 at p. 10; Docket No. 12 at pp. 9-10); see also P.R. Laws Ann. tit. 19 § 2152 ("A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor[,] and contains a statement indicating the types, or describing the items, of collateral."). Ten years later, on January 26, 2011, however, the effectiveness of the financing statement lapsed pursuant to Puerto Rico law because First Bank did not file a continuation statement.  See P.R. Laws Ann. tit. 19 § 2153(2) ("The effectiveness of a filed financing statement lapses on the expiration of the ten (10)-year period unless a continuation statement is filed prior to the lapse.").  On

_____

[5] The bankruptcy court noted that the CTA serves as the Commonwealth's adoption of the Uniform Commercial Code.  (See Docket No. 1-4 at p. 63.)

July 19, 2011, and without the signature of IHP, First Bank signed and filed the 2011 Financing Statements.  Subsequently, IHP signed and filed the Termination Statements on February 16, 2012, without First Bank's signature or authorization.

Pursuant to P.R. Laws Ann. tit. 19 § 2153 ("section 2153"), IHP's theory that the lapsing of the financing statement destroyed not only the perfection, but also the general validity, of First Bank's security interests[6] is incorrect.  Section 2153 provides that "[t]he effectiveness of a filed financing statement lapses on the expiration of the ten (10)-year period . . . [and that] [u]pon lapse the security interest becomes unperfected . . . ."  The language of the statute simply does not support IHP's contention that the lapsing of the financing statements also causes the *security interests* to lapse.  To the contrary, the lapse of a financing statement does not invalidate the security interest.  Supplies & Servs. v. Nacco Indus.  (In re Supplies & Servs.), 461 B.R. 699, 707 (B.A.P. 1st Cir. 2011) (citing Frank v. James Talcott, Inc., 692 F.2d 734, 737 (11th Cir. 1982) for the proposition that an "unperfected interest would still be enforceable as between the debtor and creditor, but it could lose priority against third party creditors")).  This is because

_____

[6] The Debtors consistently state this assumption throughout their briefs.  (See, e.g., Case No. 12-1515, Docket No. 22 at p. 16) ("First Bank's 2001 security interest expired in January 2011.  Whatever security interest First Bank had in 2001 became ineffective and unenforceable by January 2011.").

perfection of an interest, which relates to the interest of third

parties in the collateral, is "entirely independent" from an

interest's validity. (In re Supplies & Servs.), 461 B.R. at 707.

As the Bankruptcy Appellate Panel for the First Circuit has

explained:

> The attached security interest is valid as
> between the parties, has priority over a
> general creditor, but, unless perfected, is
> subject to the rights of many others acquiring
> interests in the property. On the other hand,
> to acquire rights valid against third parties,
> it is necessary that the security interest be
> perfected. A security agreement's validity is
> based upon attachment and enforceability, but
> not perfection. While "attachment" relates to
> the creation and enforceability of a security
> interest between the parties to the
> transaction, "perfection" is an additional
> step which makes the security interest
> effective against third parties . . . .
> Perfection does not affect the rights and
> obligations between a debtor and his secured
> creditor, but relates to rights among
> competing creditors or others with interests
> in the collateral. Thus, a security agreement
> can be valid between the parties without being
> perfected.

Id. Attachment of First Bank's security interests occurred with

the filing of the 2001 Finance Statements. See P.R. Laws Ann.

tit. 19 § 2153 ("A security interest attaches when it becomes

enforceable against the debtor with respect to the collateral.

Attachment occurs as soon as all of the events specified in

subsection (1) of this section have taken place . . . ."). Because

"perfection . . . does not affect the validity of the security

agreement between the debtor and the secured party," (In re

Supplies & Servs.), 461 B.R. at 707, the Debtors' erroneous assumption that the lapsing of the 2001 Financing Statements invalidated First Bank's security interests is fatal to their appeals in both Case No. 12-1515 and Case No. 12-2026.

        The Debtors' argument in Case No. 12-1515 that the 2011 Financing Statements do not meet the requirements of P.R. Laws Ann. tit. 19 § 2152 ("section 2152") is also unavailing. Section 2152 provides a mechanism for creditors to re-perfect their security interests if a prior financing statement lapses: "(2) A financing statement which otherwise complies with subsection (1) of this section is sufficient when it is signed by the secured party instead of the debtor [if] it is filed to perfect a security interest in:  . . . (c) collateral as to which the filing has lapsed . . . ." P.R. Laws Ann. tit. 19 § 2152. The Debtors argue that First Bank's July 2011 Financing Statements fail to meet the requirements of section 2152(1) and, therefore, cannot be compliant with section 2152(2). (Civil No. 12-1515, Docket No. 22 at pp. 17-20.) To comply with section 2152(1), the 2011 Financing Statements must: (1) give the names of the debtors; (2) give the names of the secured party; (3) be signed by the debtor; (4) give an address of the secured party; (5) give a mailing address of the debtor; and (6) contain a statement indicating the types, or describing the items, of collateral. P.R. Laws Ann. tit. 19 § 2152(1). Upon review of the 2011 Financing Statements, the Court

finds that all elements are met.  First, the names of IHP and HDI
are listed as debtors.  (Docket No. 22-1 at pp. 15 & 22.)  Second,
First Bank is listed as the secured party.  Id.  Third, First Bank
— the secured party — correctly signed the Financing Statement
"instead of the debtor."[7]  Id.  Fourth, First Bank's address is
listed.  Id.  Fifth, both IHP and HDI's addresses are provided.
Id. Sixth, in the section stating "THIS FINANCING STATEMENT COVERS
THE FOLLOWING TYPES OR ITEMS OF PROPERTY[,]" First Bank stated in
the first Financing Statement, "See Exhibit A attached hereto and
made a part hereof."[8]  (Docket No. 22-1 at pp. 15.)  In the second

---

[7]  Pursuant to section 2152(2)(c), the secured party may sign
the financing statement "instead of the debtor" if the financing
statement is filed to perfect a security interest in collateral as
to which the filing has lapsed.  P.R. Laws Ann. tit. 19 § 2152(c).

[8] The Court cannot subscribe to the Debtors' argument in Case
No. 12-1515 that First Bank's attachment of the expired 2001
Financing Statements to the first 2011 Financing Statement fails to
provide the necessary "description of collateral" required under
Puerto Rico law.  The 2001 Financing Statement that First Bank
attached does include an exhibit describing the collateral.  (See
Docket No. 22-1 at pp. 16-21).  It therefore constitutes a
"statement indicating the types, or describing the items, of
collateral" pursuant to section 2152(1).  See P.R. Laws Ann. tit.
19 § 2152(1).

The Debtors' reliance on In re Softalk Pub. Co., 856 F.2d
1328 (9th Cir. 1998) to dispute the adequacy of the 2001
Financing Statement as such a statement is misleading.
The court in In re Softalk Pub. Co. held that because the
financing statement at issue did not contain any
statement at all "indicating the types, or describing the
items, of collateral," the financing statement failed to
comply with California law and perfect a party's security
interest.  856 F.2d at 1331-32.  The letter from the
Puerto Rico Department of State dated May 21, 2012 (the
"Opinion Letter") is similarly unpersuasive to establish

Financing Statement, First Bank stated, "Assignment of Rents
arising from Lease Contracts over commercial properties located at
165 Quisqueya Avenue, Hato Rey, Puerto Rico, Lot 5 San Rafael
Industrial Park, Ponce, Puerto Rico and at State Road 102, Km.
150.3, Mayagüez, Puerto Rico   [executed] before Notary Public

---

that the 2001 Financing Statement is insufficient as a
matter of law to constitute the type of "a statement
indicating the types, or describing the items, of
collateral" section 2152(1) contemplates.  The statute
simply does not require, as the Opinion Letter suggests,
a copy of the parties' "agreement" demonstrating that
filing a prior financing statement is sufficient for the
new filing.  Furthermore, the Debtors fail to provide
legal support for the Opinion Letter's contention that
"[t]he same expired agreement cannot be used for a new
transaction, since the prior conditions may no longer
exist . . . ."

    The Court does finds persuasive the commentary
contained in In re Abell, 66 B.R. 375, 381 (Bankr. N. D.
Miss. 1986), cited by First Bank, that:

        the primary purpose of the perfection statutes
        is merely to notify other potential creditors
        of a secured party's interest in collateral.
        In the opinion of this Court, a secured
        party's rights in collateral would be
        adversely affected for no justifiable reason
        if the secured party was required to obtain
        the debtor's signature on the second financing
        statement, merely to replace a properly
        executed financing statement that had expired.
        The debtor has no motivation to sign the
        second financing statement because he receives
        no new or additional value.


Accordingly, it finds that the inclusion of the 2001
Financing Statements, which included a five-page exhibit
b describing the "types" and "items" of collateral, to
fully satisfy section 2152(1)'s sixth element.

Francisco M. Vazquez Santoni." <u>Id.</u> at p. 22.  Thus, the 2011
Financing Statements met all of section 2152(1)'s requirements.

        Given that the 2011 Financing Statements fully
complied with section 2152(1), and that the debtor's signature is
not required by section 2152(2)(c), the bankruptcy court correctly
found that First Bank was expressly permitted by law to file the
2011 Financing Statements without IHP's signature.  The bankruptcy
court also correctly held that First Bank's security interests lost
only their <u>perfected</u> status, not their <u>validity</u>, between the period
of January and July 2011.

        Second, the bankruptcy court analyzed whether the
Termination Statements filed by IHP in February 2012 were valid as
a matter of law.  It properly concluded that they were not.
Pursuant to P.R. Laws Ann. tit. 19 § 2154 ("section 2154"), a
termination statement should be filed when there is "no outstanding
secured obligation," and the secured creditor must authorize a

termination statement.[9]  In this case, the Credit Agreement signed by the parties posed as "an outstanding secured obligation," and First Bank, as "the secured party," did not sign the termination statement or submit a separate written and signed statement of assignment.  Thus, the bankruptcy court rightfully concluded that the document IHP filed in February 2012 failed to comply with section 2154's requirements and is not a valid termination statement that extinguished First Bank's security interests.

The Court also finds the case of <u>Roswell Capital Partners LLC v. Alternative Constr. Techs.</u>, 2010 U.S. Dist. LEXIS 90695 (S.D.N.Y. Sept. 1, 2010), upon which IHP relies, to be inapplicable.  In <u>Roswell</u>, a competing lender argued that the filing of a termination statement under the Florida UCC, even

---

[9] Section 2154 provides, in pertinent part:

> In other cases whenever there is no outstanding secured obligation and no commitment to make advances, incur obligations or otherwise give value, the secured party must on written demand by the debtor send the debtor, for each filing officer with whom the financing statement was filed, a termination statement to the effect that he no longer claims a security interest under the financing statement, which shall be identified by file number. A termination statement signed by a person other than the secured party of record must be authenticated by a notary public accompanied by a separate written statement of assignment signed by the secured party of record, with his signature authenticated by a notary public, and complying with subsection (2) of § 2155 of this title, including payment of the required fee.

P.R. Laws Ann. tit. 19 § 2154.

without the endorsement of the other secured lender, rendered the
corresponding financing statement ineffective. The Court
subscribes to the reasoning, however, that Roswell's analysis is
misguided. See Official Comm. v. JP Morgan Chase Bank, NA (In re
Motors Liquidation Co.), 486 B.R. 596, 632 n.121, 641-46 (Bankr.
S.D.N.Y. 2013) (discussing at length why Roswell was "erroneously
decided"); In re Negus-Sons, Inc., 460 B.R. 754, 757 n.10 (8th Cir.
BAP 2011) ("We are also hesitant to endorse the holding in
[Roswell], relied on by the Trustee, that a termination statement
filed by a third party is effective regardless of whether it was
authorized . . . . Roswell's holding appears to be contrary to the
plain language of the Uniform Commercial Code."); William H.
Henning & Fred H. Miller, 45 The Uniform Commercial Code Law Letter
1, 4 (2011) (criticizing Roswell as being contrary to the law).
Moreover, unlike the Florida UCC that controlled in Roswell, Puerto
Rico law explicitly requires the secured party's authorization in
order for a termination statement to be valid. P.R. Laws Ann. tit.
19 § 2154. Thus, Roswell is inapposite, and the bankruptcy court
correctly declined to adopt the Roswell decision in its analysis.
(See Docket No. 1-4 at pp. 65-66.)

        Accordingly, because First Bank properly perfected
its security interests with the 2011 Financing Statements, and
IHP's attempt to terminate the interest by filing the Termination
Statements had no effect, the bankruptcy court's May 15, 2012 order

correctly concluded that First Bank was at liberty to exercise its rights as a secured creditor and proceed according to the documents and applicable law.  (<u>See</u> Docket No. 1-4 at p. 67.)

     **2.    The "Prospective" Effect**

     IHP takes special issue with the bankruptcy court's use of the term "prospective" in its May 15, 2012 order.  The bankruptcy court "prospectively [granted] the Bank's [m]otion for [r]econsideration and determine[d] that the Bank has a valid security interest over [IHP's] cash, assets and rents."  (Docket No. 1-4 at p. 1.)  It further noted, "Since this order will have prospective effect, the Court is upholding its order of April 26, 2012, Dkt. 15, authorizing [IHP] to pay the salaries as requested in its motion of April 25, 2012, Dkt. 13."  <u>Id.</u>  In the final paragraph of the order, the bankruptcy court again proclaimed the order's "prospective" effect: "[A]s previously stated by the Court, this order shall have prospective effect starting on May 3, 2012. The Court is upholding its order of April 26, 2012, Dkt. 15, authorizing [IHP] to pay the salaries as requested in its motion of April 25, 2012, Dkt. 13."  <u>Id.</u>

     As gleaned from IHP's submissions, IHP interprets the use of the term "prospective" to mean that the bankruptcy court granted First Bank a security interest in the pre-petition

foreclosed collateral *only beginning on* May 3, 2012.[10]  (See Docket
No. 5 at p. 23 ) ("[T]he Bankruptcy Court upheld First Bank's
security interest but only with "prospective" effect . . . .
Accordingly, in the context of this case, First Bank could not have
foreclosed on [IHP's] property pre-petition.  [IHP] contends that
First Bank's conduct from May 3, 2012 to the date of the filing of
the Joint Stipulation on June 22, 2012 acknowledges this fact.");
Id. at p. 24 ("First Bank's security interest against [IHP] is
instead reliant on the May 3, 2012 [o]rder of the [b]ankruptcy
[c]ourt that grants "prospective" effect to First Bank's security
interest from the date of the May 3, 2012 order."); Id. at p. 21
("[F]rom the date that the Department of State registered the
Termination Statements, February 16, 2012, to the date that the
Bankruptcy Court held that the statements were ineffective, May 3,
2012, First Bank did not have a valid and effective security
interest.  Since First Bank contends that its alleged foreclosure
took place during this period[,] the foreclosure could not have
been pursuant to an effective and valid security interest.");
(Docket No. 13 at p. 4) ("The [b]ankruptcy [c]ourt . . . found that

---

[10] IHP refers to both a May 3, 2012 order as well as a May 15,
2012 order.  On May 3, 2012, the parties appeared before the
bankruptcy court for a hearing regarding whether First Bank has a
valid security interest of IHP's cash, assets and rents, and the
bankruptcy court issued a bench order.  (See Case No. 12-1515,
Docket No. 28 at p. 5.)  On May 15, 2012, the bankruptcy court
issued a written order disposing of the issue.  (See Case No. 12-
2026, Docket No. 1-4 at p. 1.)

First Bank had a valid lien against [IHP] but would enforce it "***prospectively***.") (emphasis in original); <u>Id.</u> at p. 8 ("[IHP] contends that the cash collateral litigation and the cash collateral orders represent the implementation of the "prospective effect" of the [b]ankruptcy [c]ourt finding that First Bank had a valid security interest and not recognition of a pre-petition foreclosure of the asset."); (Case No. 12-1515, Docket No. 29 at p. 5 n. 1 ) ("The Debtor notes that even the Order of the Bankrupty Court acknowledges the tenuous nature of First Bank's security interest by declaring the interest effective *prospectively* from May 3, 2012 and not retrospectively to the date of the July 2011 filing or to the date of the Bankruptcy Petition, April 19, 2012.") (emphasis in original).

          The Court finds no support in the record for IHP's contention that the May 15, 2012 order's "prospective" effect signifies that First Bank lacked a valid security interest at the time that it foreclosed on the collateral.  In an opinion and order dated December 26, 2012, the bankruptcy court provided additional insight into the intended meaning of "prospective" as used in the May 15, 2012 order.  (<u>See</u> Docket No. 10-2.)  The bankruptcy court clarified that the "prospective" effect took place for a "limited reason" — "because the court [did not want to] set aside its previous Order dated April 26, 2012 authorizing the use of cash collateral based upon the necessity that the employees be paid in

order that Debtors' operations continue, and particularly if the
grounds for requesting reconsideration of this Order [were] that
payment was on account of unauthorized use of cash collateral."
Id. at p. 10.  The term "prospective," therefore, was not included
to mean — as IHP contends — that First Bank's security interest
became valid and effective on May 15, 2012, the date of the
bankruptcy court's decision.    Indeed, the bankruptcy court
explicitly clarified that "the third argument based on [IHP's]
contentions that the reason the court granted prospective effect to
its first Order is due to the time line of the alleged foreclosures
(April 4, 2012) and the petition date (April 19, 2012) is
unfounded." (Docket No. 10-2 at p. 10.)  Furthermore, "the court
**did not hold that First Bank had a valid security interest as of
May 3, 2012** despite the fact that it filed the new financing
statement on July 19, 2011[;] **[T]his would be contrary to this
court's October 22, 2012 Order**." Id.  As the bankruptcy court
correctly determined, First Bank had a valid security interest well
before May 2012 — the interests became *valid* upon execution of the
2001 Financing Statements, and merely became *perfected* again with
the filing of the 2011 Financing Statements.  Accordingly, IHP's
argument that the bankruptcy court intended for its May 15, 2012
order to mark the date that First Bank's security interest would
take effect must fail.  The Court must also reject IHP's appeal
that the bankruptcy court "erred when it determined that it has

jurisdiction to confirm the legitimacy of a pre-petition foreclosure . . . ."

**B.   October 22, 2012 Order**

        In First Bank's motion requesting the immediate turnover of funds, it argued that approximately $1.2 million in proceeds generated under the pre-petition foreclosed consumer sales contracts of IHP (which were foreclosed as of April 4, 2012) and HDI (which were foreclosed as of April 23, 2012), belong to First Bank. (Docket No. 5-3 at pp. 8-15.) As First Bank's property, the accounts receivable and any proceeds thereof do not constitute property of IHP's bankruptcy estate. Id. IHP opposed First Bank's motion by contending that First Bank "now take[s] the inconsistent and ludicrous position that, despite asserting a post-petition security interest over the Debtor's property, First Bank satisfied its security interest pre-petition by 'foreclosing' on Debtor's property." (Docket No. 5-3 at p. 18.) It argues that IHP has already surrendered all receivables, whether they were "foreclosed" or not, to First Bank. Id. at p. 19. First Bank replied, however: (1) that when it foreclosed IHP's and HDI's consumer sales contracts in April 2012, it acted under a duly registered Security Agreement subscribed by the debtors and First Bank, and that the debtors' default under the terms of the Loan Agreement prompted the pre-petition foreclosure, (Docket No. 1-9 at p. 9); (2) that the bank has always contended that the proceeds from the foreclosed

accounts belong to it and not to the estates, id. at p. 10; and
(3) that because the debtors incorrectly informed their clients not
to make the payments to First Bank, diverted the foreclosed funds
from the bank, and used the proceeds against the terms of the Loan
Agreement with the bank,[11] they are unlawfully in possession of
funds that belong to First Bank.   Id.

        The bankruptcy court agreed with First Bank on October
22, 2012, ordering the debtors to "turnover to [First Bank] any
property foreclosed pre[-]petition by [First Bank] and which,
consequently, is not property of the estate."  (Docket No. 5-3 at
p. 22.)   Although it did not issue a concurrent opinion or
memorandum with its October 22, 2012 order, the bankruptcy court
later shed light on its reasoning for granting First Bank's motion:

> The October 22, 2012 Order's holding is derived from the
> May 15, 2012 Order in which this court held that [First
> Bank] properly perfected its security interests when it
> filed the financing statements on July 19, 2011, pursuant
> to [P.R. Laws Ann. tit. 19 § 2152(2)(c)] and, that [the
> Debtors'] attempt to terminate [First Bank]'s security
> interest by filing termination statements did not comply
> with [P.R. Laws Ann. tit. 19 § 2154].  Consequently, this
> court held in its October 22, 2012 Order, that [First
> Bank,] as a secured creditor[,] was entitled to be turned
> over the property (meaning the proceeds generated from
> certain accounts receivables) which it foreclosed pre-
> petition, and thus are not property of the estate.

---

[11] First Bank claims that it came to own the proceeds the
debtors received from the foreclosed accounts after First Bank
issued the Notice of Foreclosure.  "[IHP] transferred the
Portfolios, but kept the proceeds that those accounts generated
from the date of the foreclosure by [First Bank] until the
effective date of the transfer of the Portfolios."  (Docket No. 1-9
at p. 11.)

. . . .

The court's finding that [First Bank] is a secured
creditor that properly perfected its security interests
provided the basis for the October 22, 2012 Order.
[First Bank], as a secured creditor, prior to IHP and HDI
filing for bankruptcy on April 19, 2012 and on May 7,
2012[,] respectively, informed the Debtors through a
formal notice of default (addressed to Mr. A Bert Foti)
dated April 4, 2012 of the existing defaults and declared
due and payable the entire unpaid principal amount of the
loans, interest accrued and unpaid and all other amounts
payable. Subsequently, [First Bank] sent a letter dated
April 13, 2012 to the Debtors' Comptroller regarding the
legal basis for the assignment of the IHP and HDI
accounts to [First Bank] which is based on the loan
agreement. [First Bank], pursuant to the loan agreement,
exercised its right to collect the payments due under the
consumer sales contracts and all other remedies to which
it is entitled by law. Due to Debtors' defaults under
the terms of the loan agreement, [First Bank] foreclosed
pre-petition certain consumer sales contracts by
informing Debtors' clients pre-petition to send [First
Bank] any payments due or that became due under the
consumer sales contracts. [First Bank], on May 22, 2012,
provided [the] Debtors' attorney with the list of the
clients it had notified of the assignment of IHP and
HDI's accounts. Thus, the court concluded that the
payments generated from the consumer sales contracts
which were foreclosed pre-petition had to be turned over
to [First Bank] because the same were not property of the
estate.

(Docket No. 10-2 at pp. 7–9) (internal citations omitted).

In light of the reasoning above, as well as the
bankruptcy court's reasoning in its May 15, 2012 order, IHP's
contention that it was "plain error" to have granted First Bank a
turnover of proceeds from certain consumer sales contracts is
unavailing. IHP's submission is based on the assumption that First
Bank's security interests in the collateral took effect in May 2012
upon the bankruptcy court's order. Because, as discussed in the

previous section, that assumption is unfounded, the May 15, 2012
order recognizing First Bank's security interests, and the
October 22, 2012 order granting First Bank a turnover of proceeds,
are not irreconcilable.   Pursuant to the duly registered Security
Agreement subscribed by IHP and First Bank, First Bank enjoyed a
security interest in the pre-petition collateral beginning in 2001.
It had the right to foreclose on IHP's pre-petition accounts
receivable when IHP defaulted,  therefore, because it owned the
proceeds IHP received from those foreclosed accounts after First
Bank issued the Notice of Foreclosure.[12]   See In re: AA 10,000
Corp., Case No. 07-06601 (ESL) at p. 4 (Bankr. D.P.R.) (Dec. 11,
2007) ("When the Debtor received the notice of default . . . it is

---

[12] The Court agrees with the bankruptcy court in "fail[ing] to
understand the basis for [IHP's] argument that the four hearings
and the join[t] stipulation governing the use of cash collateral
effectively invalidate [First Bank's] position that it foreclosed
on the property pre-petition."  (Docket No. 10-2 at p. 11.)  The
Joint Motion specifically limited IHP's request for cash collateral
to the use and sale of its inventories, and it agreed to surrender
its "portfolio of all accounts receivable . . . as of the Petition
Date."  (Docket No. 5-3 at p. 3.)  There is nothing in the record
to contradict the bankruptcy court's finding that First Bank's
position regarding its interests in the pre-petition and post-
petition consumer sales proceeds "has been the same through this
case[,] which is simply that pursuant to the [S]ecurity
[A]greement[,] [First Bank] is entitled to [IHP's] receipts of
whatever monies [IHP] receives."  (Docket No. 10-2 at p. 11.)
Although IHP pledged "full cooperation in the transfer of the
Portfolios to [First Bank] . . . in order to continue the effective
and efficient collection of such Portfolios, i.e. pre-petition
Account Receivables, and maximize their proceeds[,]" (Docket No. 5-
3 at p. 3), at the time of the petition IHP lacked all equity in
those accounts receivable or any proceeds thereof, and First Bank
was rightfully entitled to foreclose on the property.

unquestionable that [the secured creditor] was immediately authorized to exercise it[s] rights under the loan agreement, including the right to foreclose and exercise control over the collateral."); Docket No. 1-4 at p. 31.[13]  Accordingly, on October 22, 2012, the bankruptcy court correctly granted First Bank a turnover of any amount IHP had received, but had failed to surrender, from the foreclosed accounts after the Notice of Foreclosure.  See In re: AA 10,000 Corp., 07-06601 at pp. 8-9; Docket No. 1-4 at pp. 32-33 (holding that once a secured creditor effectuates a valid pre-petition foreclosure on property that includes accounts receivable, a debtor has no equity in either the accounts receivable or any proceeds gained from the accounts).

**IV. CONCLUSION**

For the reasons discussed above, the Court fully **AFFIRMS** the bankruptcy court's findings in both, Case No. 12-1515 and Case No. 12-2026.

---

[13] First Bank may rely on this unpublished opinion of the Bankruptcy Court of Puerto Rico to support its position.  See Fed. R. App. P. 32.1 ("(a) Citation Permitted.  A court may not prohibit or restrict the citation of federal judicial opinions, orders, judgments, or other written dispositions that have been: (i) designated as "unpublished," "not for publication," "non-precedential," "not precedent," or the like; and (ii) issued on or after January 1, 2007.").  IHP acknowledges that "the Court in In re AA 10,000 held that when an entity lawfully forecloses on property of a debtor before the bankruptcy petition, the foreclosed property does not become property of the estate."  (Docket No. 13 at p. 5.)  Because, as discussed above, IHP's argument that First Bank did not assert a valid pre-petition foreclosure is erroneous, the Court regards In re AA 10,000 as persuasive authority indicative of IHP's fate.

Judgment shall be entered accordingly in both cases.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, July 1, 2013.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
United States District Judge